# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

JUAN PINEDA-MORENO,
          *Defendant-Appellant.*

No. 08-30385

D.C. No.
1:07-CR-30036-PA

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, District Judge, Presiding

Argued and Submitted
October 5, 2009—Portland, Oregon

Filed January 11, 2010

Before: Diarmuid F. O'Scannlain and N. Randy Smith,
Circuit Judges, and Charles R. Wolle,*
Senior District Judge.

Opinion by Judge O'Scannlain

---

*The Honorable Charles R. Wolle, Senior United States District Judge
for the Southern District of Iowa, sitting by designation.

## COUNSEL

Harrison Latto, of Portland, Oregon, argued the cause for the defendant-appellant and filed the briefs.

Amy E. Potter, of Portland, Oregon, Assistant United States Attorney for the District of Oregon, argued the cause for the appellee. Karin J. Immergut, United States Attorney for the District of Oregon, and Judith R. Harper, of Medford, Oregon, Assistant United States Attorney for the District of Oregon, were on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether law enforcement officers violate a suspect's Fourth Amendment rights when they enter the curtilage of his home and attach a mobile tracking device to the undercarriage of his car.

I

A

On May 28, 2007, a Drug Enforcement Administration ("DEA") special agent noticed a group of men purchasing a large quantity of fertilizer from a Home Depot. Recognizing the fertilizer as a type frequently used to grow marijuana, he followed the men as they left the store and saw them drive away in a silver 1997 Jeep Grand Cherokee. Law enforcement later identified one of the men as Juan Pineda-Moreno, the owner of the Jeep.

In June, DEA agents obtained information that Pineda-Moreno and his associates had purchased large quantities of groceries, irrigation equipment, and deer repellant at several stores. On several of these occasions, the group traveled in Pineda-Moreno's Jeep. Agents eventually followed these individuals to a trailer home Pineda-Moreno was renting at the time.

After learning where Pineda-Moreno lived, agents escalated their investigation. Over a four-month period, agents repeatedly monitored Pineda-Moreno's Jeep using various types of mobile tracking devices. Each device was about the size of a bar of soap and had a magnet affixed to its side, allowing it to be attached to the underside of a car.

Agents installed these devices on the underside of Pineda-Moreno's Jeep on seven different occasions. On four of these occasions, the vehicle was parked on a public street in front of Pineda-Moreno's home. On one occasion, it was located in a public parking lot. On the other two occasions, the Jeep was parked in Pineda-Moreno's driveway, a few feet from the side of his trailer. The driveway leading up to the trailer was open; agents did not observe any fence, gate, or "No Trespassing" signs indicating that they were not to enter the property. The agents entered Pineda-Moreno's driveway between 4:00 and 5:00 a.m and attached the tracking devices to the Jeep. Once in place, the tracking devices recorded and logged the precise movements of the vehicle. Some of these devices permitted agents to access the information remotely, while others required them to remove the device from the vehicle and download the information directly.

On September 12, 2007, information from a mobile tracking device alerted agents that Pineda-Moreno's vehicle was leaving a suspected marijuana grow site. Agents followed the Jeep, pulled it over, and smelled the odor of marijuana emanating from a passenger in the backseat of the vehicle. The agents contacted immigration authorities, who arrested all three individuals in the vehicle for violations of immigration laws. Pineda-Moreno subsequently consented to a search of his vehicle and home. In Pineda-Moreno's trailer, agents found two large garbage bags full of marijuana.

B

On November 2, 2007, a grand jury indicted Pineda-Moreno on one count of conspiracy to manufacture marijuana

in violation of 21 U.S.C. § 846(a)(1) and (b)(1)(A)(vii), and one count of manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vii). In the district court, Pineda-Moreno moved to suppress the evidence obtained from the mobile tracking devices, arguing that agents violated his Fourth Amendment rights by attaching the devices to his vehicle. The district court denied his motion to suppress. After the district court's ruling, Pineda-Moreno entered a conditional guilty plea, reserving the right to appeal the denial of his motion to suppress. Pineda-Moreno timely appealed.

## II

Pineda-Moreno first argues that by attaching mobile tracking devices to the undercarriage of his Jeep, agents invaded an area in which he possesses a reasonable expectation of privacy, thereby violating his Fourth Amendment rights. The agents attached these devices both while his vehicle was parked in his driveway and while it was parked in public areas, such as a street and a public parking lot. We consider each of these circumstances separately.

## A

Pineda-Moreno argues that the agents violated his Fourth Amendment rights by entering his driveway between 4:00 and 5:00 a.m. and attaching the tracking devices to the underside of his Jeep. We rejected a similar argument in *United States v. McIver*, 186 F.3d 1119 (1999). There, agents suspected that McIver was growing marijuana. *Id.* at 1122- 23. As part of their investigation, the agents entered McIver's driveway at 3:30 a.m. and attached a mobile tracking device to the underside of his vehicle, which was parked in front of his garage outside the curtilage of his home. *Id.* at 1123. By monitoring the signal from the tracking device, the agents learned that the car was in the vicinity of a known marijuana grow site, evidence that later proved critical at McIver's trial for drug charges. *Id.*

**[1]** McIver moved to suppress this evidence, arguing that the act of placing the tracking devices on the underside of his Jeep constituted an unreasonable "search" in violation of his Fourth Amendment rights. *Id.* at 1126. We rejected that argument. First, we held that because the agents did not enter the curtilage of McIver's home to attach the tracking device, he could not claim that they invaded an area in which he had a reasonable expectation of privacy. *Id.* Second, we concluded that attaching the tracking device to McIver's vehicle did not constitute a "search" cognizable under the Fourth Amendment because "[t]he undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy." *Id.* at 1127 (quoting *United States v. Rascon-Ortiz*, 994 F.2d 749, 754 (10th Cir. 1993)).

**[2]** Pineda-Moreno's case differs from *McIver* in only one respect. Whereas McIver conceded that his car was *not* parked within the curtilage of his home when the agents attached the tracking device, *id.* at 1126, the government here concedes that Pineda-Moreno's Jeep *was* parked within the curtilage of his home when the agents attached the tracking device. We need not decide, however, whether Pineda-Moreno's vehicle was parked within the curtilage of his home. Even assuming it was, it was parked in his driveway, which "is only a semi-private area." *United States v. Magana*, 512 F.2d 1169, 1171 (9th Cir. 1975). "In order to establish a reasonable expectation of privacy in [his] driveway, [Pineda-Moreno] must support that expectation by detailing the special features of the driveway itself (i.e. enclosures, barriers, lack of visibility from the street) or the nature of activities performed upon it." *Maisano v. Welcher*, 940 F.2d 499, 503 (9th Cir. 1991). Pineda-Moreno offers no such evidence. To the contrary, the driveway had no gate, no "No Trespassing" signs, and no features to prevent someone standing in the street from seeing the entire driveway. Additionally, one of the investigating agents testified that "an individual going up to the house to deliver the newspaper or to visit someone would have to go through the driveway to get to the house." If a neighborhood child had

walked up Pineda-Moreno's driveway and crawled under his Jeep to retrieve a lost ball or runaway cat, Pineda-Moreno would have no grounds to complain. Thus, because Pineda-Moreno did not take steps to exclude passersby from his driveway, he cannot claim a reasonable expectation of privacy in it, regardless of whether a portion of it was located within the curtilage of his home.

**[3]** Pinedo-Moreno argues that the driveway was nonetheless an area in which he possessed a reasonable expectation of privacy because the agents entered his driveway between 4:00 and 5:00 a.m. But just as the timing of the agents' actions was immaterial to our analysis in *McIver*, where we upheld agents' entry onto a suspect's driveway at 3:30 a.m. to attach a mobile tracking device to his vehicle, 186 F.3d at 1123, 1126, the time of day is immaterial here.

Finally, Pineda-Moreno argues that even if the agents' presence in his driveway did not violate the Fourth Amendment, their decision to attach the tracking device to the underside of his Jeep did. *McIver* forecloses this argument as well because there we held that the undercarriage of a vehicle, as part of its exterior, is not entitled to a reasonable expectation of privacy. *Id.* at 1127.

**[4]** In sum, Pineda-Moreno cannot show that the agents invaded an area in which he possessed a reasonable expectation of privacy when they walked up his driveway and attached the tracking device to his vehicle. Because the agents did not invade such an area, they conducted no search, and Pineda-Moreno can assert no Fourth Amendment violation. *See California v. Ciraolo*, 476 U.S. 207, 211 (1986).

B

**[5]** Pineda-Moreno also argues that the agents violated his Fourth Amendment rights by attaching mobile tracking devices to his Jeep while it was parked on a street in front of

his home and in a public parking lot. As he admits, this argument is foreclosed by our precedent. In *McIver*, we held that officers do not invade an area in which a suspect possesses a reasonable expectation of privacy when they attach a mobile tracking device to a car parked in his driveway but outside the curtilage of his home. 186 F.3d at 1126. Applying *McIver*, we conclude that the agents did not violate Pineda-Moreno's Fourth Amendment rights by affixing the mobile tracking devices to the underside of his Jeep while it was parked on a public street and parking lot—areas where Pineda-Moreno can assert no reasonable expectation of privacy.

## III

[6] Pineda-Moreno's last claim is that the agents' use of mobile tracking devices continuously to monitor the location of his Jeep violated his Fourth Amendment rights because the devices attached to his vehicle are not generally used by the public.[1] He acknowledges that in *United States v. Knotts*, the Supreme Court held that law enforcement officers do not conduct a "search" cognizable under the Fourth Amendment by using a beeper to track a vehicle because "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." 460 U.S. 276, 281- 82 (1982). Pineda-Moreno asserts, however, that *Knotts* should not control his case because the Court heavily modified the Fourth Amendment analysis applicable to such technological devices in *Kyllo v.*

---

[1]The parties dispute the standard of review applicable to this claim. The government contends that Pineda-Moreno failed to raise this argument before the district court and accordingly we should review only for plain error. In response, Pineda-Moreno asserts that language in the government's response to his motion was broad enough to bring the argument to the court's attention, and we therefore should review the district court's decision de novo. We need not resolve this dispute, however, as we conclude that by denying Pineda-Moreno's motion to suppress, the district court committed no error, plain or otherwise. Thus, under either standard of review, we would reach the same result.

*United States*, 533 U.S. 27 (2001). There, the Court held that using thermal imaging technology to obtain "any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search—at least where . . . the technology in question is not in general public use." *Id.* at 34 (internal quotation marks and citations omitted). From this holding, he contends that law enforcement officers conduct a "search" whenever they use sense-enhancing technology not available to the general public to obtain information.

**[7]** Pineda-Moreno misstates the relationship between the two cases. In *Kyllo*, thermal-imaging technology provided a substitute for a search unequivocally within the meaning of the Fourth Amendment, whereas in *Knotts*, as in this case, "[t]he substitute . . . is for an activity, namely following a car on a public street, that is unequivocally *not* a search within the meaning of the amendment." *United States v. Garcia*, 474 F.3d 994, 997 (7th Cir. 2007). Pineda-Moreno makes no claim that the agents used the tracking devices to intrude into a constitutionally protected area. The only information the agents obtained from the tracking devices was a log of the locations where Pineda-Moreno's car traveled, information the agents could have obtained by following the car. "Insofar as [Pineda-Moreno's] complaint appears to be simply that scientific devices such as the [tracking devices] enabled the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police efficiency with unconstitutionality and decline to do so now."**²**

---

**²**We note that three state supreme courts have concluded that the use of a tracking device is impermissible under their respective state constitutions. *See People v. Weaver*, 909 N.E.2d 1195 (N.Y. 2009); *State v. Jackson*, 76 P.3d 217 (Wash. 2003) (holding, under a state constitutional provision more protective than the Fourth Amendment, that police may not use a mobile tracking device without a warrant); *State v. Campbell*, 759 P.2d 1040 (Or. 1988) (holding that using a tracking device without a warrant or obviating exigency violates the state constitution). *But see*

*Knotts*, 460 U.S. at 284. We conclude that the police did not conduct an impermissible search of Pineda-Moreno's car by monitoring its location with mobile tracking devices.[3]

## IV

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**

---

*Osburn v. State*, 44 P.3d 523 (Nev. 2002) (following *McIver* and holding that the police use of a mobile tracking device does not infringe a reasonable expectation of privacy). In *Weaver*, for example, the New York Court of Appeals expressed fear that to permit the police to use tracking devices "would be to countenance an enormous unsupervised intrusion by the police agencies of government upon personal privacy." 909 N.E.2d at 1202. "But the fact is that the 'reality hardly suggests abuse.'" *Knotts*, 460 U.S. at 284- 85 (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 566 (1978)). We, like the Seventh Circuit, believe that "[s]hould [the] government someday decide to institute programs of mass surveillance of vehicular movements, it will be time enough to decide whether the Fourth Amendment should be interpreted to treat such surveillance as a search." *Garcia*, 474 F.3d at 998.

[3]Because we conclude that the agents did not "search" Pineda-Moreno's car, we do not comment on the district court's conclusion that the agents had reasonable suspicion that he was engaged in criminal activity.